UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL NO. 3:23CR138 (MPS) |
| v. | : | |
| | : | |
| JAKE SCOTT FLEWELLYN | : | December 12, 2023 |

**GOVERNMENT'S MEMORANDUM OF LAW IN AID OF SENTENCING**

I. **Factual and Procedural Background**

The government agrees with the offense conduct and relevant conduct set forth in the Pre-Sentence Report ("PSR"). PSR ¶¶ 6-17. From approximately November 2021 through April 2022, the defendant Jake Scott Flewellyn ("Mr. Flewellyn") knowingly accessed, viewed, possessed, received, and distributed child pornography through the Kik application on his cellular phone, an Apple iPhone XR. *Id*. at ¶ 8. In December of 2021, Kik reported that user "stonerloner17," who was later identified as Mr. Flewellyn, uploaded and shared two images and 84 videos depicting suspected child pornography between November 12, 2021 and December 15, 2021. *Id*. at ¶ 10. After Kik deactivated the account, Mr. Flewellyn created a second Kik account with username "stonerloner27" to continue to view and share child pornography. *Id*. at ¶¶ 11, 13. In April of 2022, Kik reported that Kik user "stonerloner27" uploaded and shared 21 videos depicting suspected child pornography between March 10, 2022 and March 30, 2022. *Id*. at ¶ 11. In total, Mr. Flewellyn knowingly trafficked two images and 105 videos of child pornography through his Kik accounts. *Id*. at ¶ 16; Doc. 44 at 12 (stipulation of offense conduct).

During an interview with agents from the Federal Bureau of Investigation ("FBI") on April 12, 2022, Mr. Flewellyn made several statements regarding his use of the phone and Kik accounts. *Id*. Although he initially denied using the "stonerloner17" and "stonerloner27" Kik accounts, he

later admitted to using both accounts. *Id*. at ¶ 13. He stated that he created the "stonerloner27" account after Kik deactivated the "stonerloner17" account. *Id*. He stated he believed Kik deactivated the "stonerloner17" account for violating Kik's terms of service. He also said he used the Kik accounts to view child pornography and conduct other unrelated activities. *Id*. Additionally, he said that he used the phone to access the file sharing site Mega.com. *Id*.

Mr. Flewellyn admitted that he first viewed a picture or video approximately one year before the interview. *Id*. at ¶¶ 12-13. He further admitted to distributing child pornography to other Kik users in various public and private groups within the application and estimated that he sent approximately ten to twenty videos each day he used the Kik application. *Id*. at ¶¶ 14. He also estimated that he used the application every other day but would take some week-long breaks. *Id*. He admitted to viewing child pornography with victims as young as one or two years old but said his attraction focused on females aged 13 to 16 years old. *Id*.

On May 11, 2022, federal authorities arrested Mr. Flewellyn based on a criminal complaint charging him with distribution of child pornography and accessing with intent to view child pornography. *See* Doc. Nos. 1, 13. On July 31, 2023, Mr. Flewellyn waived indictment and pled guilty to a single count information charging him with possessing and accessing with intent to view child pornography in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2). *See* Doc. Nos. 43, 44. His maximum penalties include a term of imprisonment of 20 years, a term of supervised release of five years to life, a fine of $250,000, a $100 mandatory special assessment pursuant to 18 U.S.C. § 3013, and $22,000 in additional assessments. PSR at 1. In addition, pursuant to 18 U.S.C. § 2259, the Court must order Mr. Flewellyn to pay restitution to his victims. PSR ¶ 18. In the plea agreement, Mr. Flewellyn also agreed to forfeit his interest in his iPhone XR, which he

used to commit the offense.[1] *See* Plea Agreement at 4; PSR ¶ 91. In the agreement, Mr. Flewellyn agreed that he would not seek a sentence of less than 24 months imprisonment. Doc. 44 at 6.

The PSR calculated Mr. Flewellyn's total offense level with acceptance of responsibility under the Federal Sentencing Guidelines to be 30. PSR ¶¶ 30-43. The PSR determined that Mr. Flewellyn has no criminal history, which places him in Criminal History Category I. PSR ¶¶ 48. As a result, the PSR concluded that Mr. Flewellyn faces a Guidelines range of 97 to 121 months of imprisonment, a term of supervised release of five years to life, and a fine of $30,000 to $250,000. PSR ¶¶ 85, 93, 100.

The government agrees with the Guidelines calculation in the PSR, which is the same calculation that the parties agreed to in the Plea Agreement. The Government also has no objections to the PSR.

## II. Discussion of sentencing and 3553(a) factors

The government agrees with Mr. Flewellyn that the Guidelines range in this case may be more than necessary to accomplish the goals of sentencing. Accordingly, the government respectfully requests that the Court impose a just and appropriate non-Guidelines sentence greater than 24 months of imprisonment, followed by a period of supervised release of at least five years. Such a sentence will reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense, while also affording adequate deterrence to future criminal conduct, and it will take into account Mr. Flewellyn's history and characteristics, including any mitigating circumstances.

In this case, Mr. Flewellyn's offense was a very serious one. Over the course of at least six months (and perhaps for about a year) in 2021 and 2022, he received, viewed, and distributed

---

[1] The government will separately file a motion for forfeiture.

images and videos depicting child sex abuse. PSR ¶ 8. After Kik deactivated his first account, Mr. Flewellyn created a second Kik account to continue to view and distribute child pornography. *Id*. at ¶ 13. He viewed and distributed child pornography that depicted sadistic conduct and pornography that involved victims as young as one or two years old. *Id*. at ¶ 16. As some of the victim impact statements make clear, the trafficking of such images and videos profoundly impacts the children who are victimized in them. *See* PSR ¶¶ 20-24.  The Supreme Court has recognized:

> [P]ornography poses an even greater threat to the child victim than does sexual abuse or prostitution. Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place. A child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography.

*New York v. Ferber*, 458 U.S. 747, 759-60 & n.10 (1982); *see United States v. Sherman*, 268 F.3d 539, 547-48 (7th Cir. 2001) ("Although society at large is also a victim of these crimes, the primary, identifiable victim is the child portrayed, who must live with the knowledge that adults . . . can pull out a picture or watch a video that has recorded the abuse of that child at any time.").

Although Mr. Flewellyn did not create child pornography, he received and redistributed images and videos. His conduct perpetuated the victimization of the children depicted in the images and videos each time he received them. His redistribution of the videos is obviously more concerning because it facilitated other individuals in victimizing the child depicted in the images and videos. As one victim in this case stated, "As a child I didn't have a choice what happened to me. Now, I have to suffer twice; the first time was being abused and the second time is the ongoing anxiety due to the images of my abuse (sic) forever accessible. It's impossible to cope with and accept that I have to live with the images of my abuse being available on the internet indefinitely." PSR ¶ 20. Another victim stated "I am still having emotional and psychological problems due to

knowing that the images of me being abused as a child are circulated freely on the internet . . . I know now that my life will always be an emotional roller coaster because of the 'public' nature of my own private hell." PSR ¶ 24.

The PSR describes Mr. Flewellyn's childhood growing up and sharing close relationships with both parents, a brother, and his grandparents. PSR ¶¶ 53-55.  He enjoyed an enviable childhood that included annual vacations, regular family dinners, and success in youth hockey with his father coaching several of his teams. *Id.* His parents argued several times a month but always ended each day saying, "I love you." *Id*. at ¶ 56.

Despite his positive home-life, he states that he "struggled for over a decade with severe depression, anxiety, body image and weight issues, and prolonged and continued grief that he was not able to cope with or process appropriately." The cause of his severe depression appears to stem from bullying in high school about his weight (even by his friends), the loss of his grandparents, and becoming "distant" with his girlfriend during a long-term relationship. *Id*. at ¶¶ 57, 60, 68-69. The government is sympathetic to Mr. Flewellyn's mental health issues and appreciates the impact of these events on him, but these circumstances are not uncommon and do little to explain or mitigate his criminal conduct.

Dr. Kathryn Thomas, a licensed psychologist and Research and Writing attorney for the Federal Defender's Office, interviewed and evaluated Mr. Flewellyn. Ex. I. She states that Mr. Flewellyn experienced feelings of loneliness and isolation when he and his girlfriend "became distant," and he turned to pornography as an "emotional escape." She opines that Mr. Flewellyn's depression, grief, and anxiety led to a chronic state of hopelessness and lack of meaning, which contributed to his pornography use as form of maladaptive coping. Additionally, she states that research has revealed that loneliness and hopelessness, both of which are symptoms of depression

and grief, can contribute to "problematic pornography use." She explains that research has revealed that excessive pornography use is often a form of "affection substitution," such that people experiencing loneliness or distance in their social and romantic relationships may turn to pornography as a temporary relief.

The government is uncertain whether "problematic pornography use" and "affection substitution" in the report refers to excessive use of adult pornography or viewing child pornography, or both, but it is unclear how his "feelings of loneliness and hopelessness" would lead to him watching child pornography, including the sexual abuse of infants, toddlers, and prepubescent minors, rather than adult pornography, much less explain why he began distributing such material to others. As previously mentioned, the government is sympathetic to Mr. Flewellyn's mental health issues, and they should be considered under the 3553(a) factors in determining an appropriate sentence, but in the government's view, these circumstances do little to explain or mitigate his receiving and distributing child pornography, especially here where the images and pictures included prepubescent females engaging in vaginal or anal intercourse and performing oral sex as well as material that portrays victims that are infants and toddlers.

Accordingly, there is a need to protect the public from Mr. Flewellyn and to deter him from engaging in such conduct in the future. Dr. Hobson opines that, based upon current research findings, Mr. Flewellyn is a very low risk for committing a future sexual offense, but no one can be considered to present "zero risk." Ex. J. This danger and need to protect the public warrants a sentence of imprisonment and a lengthy period of supervised release to ensure he does not return to this behavior after his release from prison. Mr. Flewellyn will undoubtedly face additional setbacks in life, similar to the ones he previously faced, and he needs adequate deterrence to ensure he avoids returning to his participation in criminal activity. There is also a need for general

deterrence and promoting respect for the law so that others are deterred from engaging in similar conduct. *See, e.g., United States v. Schrank*, 975 F.3d 534, 536 (6th Cir. 2020) ("general deterrence is crucial in the child pornography context." (internal quotation and citation omitted)); *United States v. Pugh*, 515 F.3d 1179, 1194 (11th Cir. 2008) (stating that general deterrence "is particularly compelling in the child pornography context[.]"). In his sentencing memorandum, Mr. Flewellyn argues for a departure pursuant to U.S.S.G. U.S.S.G. § 5H1.4 or variance due to his young age, height, and weight. *See* Def.'s Sentencing Mem. at 18-19. Section 5H1.4 only allows for departures based on physical condition or appearance, including physique, if present to an "unusual degree." Here, the government does not believe that his age, height, or weight are so unusual to warrant a departure. *See* Bureau of Prisons, Inmate Age, *available at* https://www.bop.gov/about/statistics/statistics_inmate_age.jsp (last accessed Dec. 12, 2023) (noting that nearly 18,000 inmates are between ages 26 and 30); Centers for Disease Control and Prevention, Body Measurements, *available at* https://www.cdc.gov/nchs/fastats/body-measurements.htm (last accessed Dec. 12, 2023) (noting that average male height is 5'9", which is only one inch higher than Mr. Flewellyn's height).

Nonetheless, the government recognizes that Mr. Flewellyn has no prior criminal history, has been totally compliant with the conditions of his release, has demonstrated a commitment to recovery and repaying the victims, and has experienced mental health issues, as described in his sentencing memorandum and accompanying psychological evaluation, that should be considered as part of the Court's analysis of the Section 3553(a) factors. Accordingly, the government respectfully asks the Court to impose a just and appropriate non-Guidelines sentence greater than 24 months of imprisonment followed by a period of supervised release of at least five years.

### III.     Victim Notification and Restitution

The government has notified identified victims who have not opted out of victim notification about the upcoming sentencing hearing and their rights under the Crime Victim Rights Act. As noted in the PSR, the government has received victim impact statements from five of the identified victims and has provided those statements to the U.S. Probation Office. PSR ¶ 19. The PSR provides excerpts from the impact statements, and the government understands that Probation has provided these statements to the Court. *Id.* at ¶¶ 20-25.

In addition, under 18 U.S.C. § 2259, a district court is required to award restitution to victims. In determining the amount of restitution, "the court shall order restitution in an amount that reflects the defendant's relative role in the causal process that underlies the victim's losses, but which is no less than $3,000." 18 U.S.C. § 2259(b)(2)(B). In *Paroline v. United States*, 134 S. Ct. 1710 (2014), the Supreme Court identified seven factors a district court may consider that "bear on the relative causal significance of the defendant's conduct" in relation to the victims' losses: 1) "the number of past criminal defendants found to have contributed to the victim's general losses;" 2) "reasonable predictions of the number of future offenders likely to be caught and convicted for crimes contributing to the victim's general losses;" 3) "any available and reasonably reliable estimate of the broader number of offenders involved (most of whom will, of course, never be caught or convicted);" 4) "whether the defendant reproduced or distributed images of the victim;" 5) "whether the defendant had any connection to the initial production of the images;" 6) "how many images of the victim the defendant possessed;" 7) "and other facts relevant to the defendant's relative causal role." *Id.* at 1728.

To date, the government has received six requests for restitution,[2] which have been provided to the defense and the Probation Office. The defendant states that he has reached agreements with four of the six victims. Pursuant to 18 U.S.C. § 3664(d)(5), the government intends to request that the Court set a restitution hearing for 90 days after sentencing to allow counsel to coordinate with the victims' counsel to see if agreement can be reached on restitution, and to fully brief the restitution issues if agreement cannot be reached. *See* 18 U.S.C. § 3664(d)(5) (providing that if identified victim's losses cannot be ascertained 10 days prior to the date of sentencing, the Court "shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing").

## IV.     Conclusion

For the reasons stated above, the Government respectfully asks the Court to impose a just and appropriate non-Guidelines sentence that is greater than 24 months of imprisonment followed by a period of supervised release of at least five years.

Respectfully submitted,

VANESSA ROBERTS AVERY
UNITED STATES ATTORNEY

   /s/
ROBERT S. DEARINGTON
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO.: ct28862
450 MAIN STREET, 3RD FLOOR
HARTFORD, CT 06103
PHONE NO. (203) 821-3700
EMAIL: robert.dearington@usdoj.gov

---

[2] The defendant states in his memorandum that he received five requests, however, this may not include the most recent victim request.

CERTIFICATE OF SERVICE

    I hereby certify that on December 12, 2023, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

                                                                 /s/_____
                                                              ROBERT S. DEARINGTON
                                                             ASSISTANT UNITED STATES ATTORNEY